835 So.2d 912 (2002)
Esther HENRY, Kim Henry (Murray), and Curtis Jones,
v.
The PARISH OF JEFFERSON, through the DEPARTMENT OF PARKS AND RECREATION, Traveler'S Insurance Company, and William Coleman, Sr., et al.
No. 02-CA-748.
Court of Appeal of Louisiana, Fifth Circuit.
December 30, 2002.
Rehearing Denied February 10, 2003.
Lester J. Waldmann, Brian C. Beckwith, Gretna, LA, Jim S. Hall, Metairie, LA, for Appellant.
Michael F. Grennan, Metairie, LA, for Appellee, Travelers Insurance Company.
William P. Connick, Michael S. Futrell, Metairie, LA, for Appellees, Parish Of Jefferson.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY and MARION F. EDWARDS.
MARION F. EDWARDS, Judge.
Plaintiffs/Appellants appeal a jury verdict finding that the defendant, The Parish *913 of Jefferson, through the Department of Parks and Recreation, was not at fault or negligent for several shootings which occurred at Marrero Action Center Playground on the evening of November 14, 1992. For the following reasons, we affirm.
On the afternoon of November 14, 1992, Lakesha Lambert ("Lambert"), who was then a minor, appeared at the Marrero Action Center (MAC), in order to rent the upstairs room of the gym for her "Sweet Sixteen" birthday party. In booking the room for the party, Lambert was assisted by playground supervisor, William Coleman (Coleman). Lambert was required to fill out a form in conjunction with the room rental. On the form, Lambert indicated that the party would last from 8:00 p.m. until 1:00 a.m., and that eight chaperones would be present. Based on these assurances, Coleman allowed Lambert to reserve the room, as there was no MAC prohibition against renting rooms to minors. Because the amount of guests indicated on the form was below 100 persons, Jefferson Parish Recreation Department rules did not require the mandatory presence of a security officer. The party was by invitation only.
On the night of the November 14, Coleman twice called the Jefferson Parish Sheriff's Office, once to have the JPSO pass by as part of their normal rounds, and the second time to report an excess number of cars in the MAC parking lot. During the course of the evening the party drew many uninvited individuals who congregated in the MAC parking lot. At 12:06 a.m. on the morning of November 15, Coleman had called the JPSO a third time to request assistance in shutting down the party when, at the same time, he heard gun shots being fired. After police arrived, among several victims who had been shot, it was discovered that Corey Henry had been killed by the gunfire and that plaintiff, Curtis Jones, had become paralyzed as a result of his bullet wounds.
Plaintiffs filed suit on November 12, 1993, and, in supplemental and amending petitions, added the Parish of Jefferson through the Department of Parks and Recreation (Jefferson Parish) as a defendant, alleging that Jefferson Parish, through William Coleman, was negligent for failing to provide security and supervision for the party on the night that the shootings occurred.
The trial of this matter began before a jury on September 10, 2001, and the jury rendered a verdict in favor of Jefferson Parish on September 18, 2001, finding no fault or negligence on their behalf by William Coleman. Plaintiffs timely filed this appeal.

LAW AND ARGUMENT
In their first assignment of error, plaintiffs assert that the jury erred in finding no fault on the part of Jefferson Parish for the shootings that took place.
In Canter v. Koehring Co.,[1] the Louisiana Supreme Court stated:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
In Perkins v. Entergy Corp.,[2] The Louisiana Supreme Court further noted in regard to appellate review of jury verdicts:

*914 A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Id. (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Further, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221.
In the determination of whether a defendant is liable under La. C.C. art. 2315, Louisiana has established a duty-risk analysis, which was explained the Louisiana Supreme Court in Posecai v. Wal Mart[3]
This court has adopted a duty-risk analysis to determine whether liability exists under the particular facts presented. Under this analysis the plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. Syrie v. Schilhab, 96-1027, p. 4-5 (La.5/20/97), 693 So.2d 1173, 1176-77; Berry v. State, 93-2748, p. 4 (La.5/23/94), 637 So.2d 412, 414. Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. LeJeune v. Union Pacific R.R., 97-1843, p. 6 (La.4/14/98), 712 So.2d 491, 494.
In regard to the liability for injury of governmental agencies operating playgrounds, this court noted in Dussouy v. City of Kenner:[4]
Municipalities must exercise that care in the maintenance and operation of its public parks, playgrounds and recreational areas, and the appliances therein and thereof, commensurate with ordinary and reasonable care under the circumstances. The municipality is not the insurer of the safety of those making use of such facilities, neither is it required to eliminate every source or possibility of danger.
. . . .
The duty is not to insure against the possibility of an accident, but to act reasonably. A governmental agency or municipality operating a public park or playground is held to the same degree of care arising from ownership as any other person in possession and control of land; this rule requires that the agency or municipality use reasonable or ordinary care to keep the premises in reasonably safe condition for those using them. Sutter v. Audubon Park Commission, 533 So.2d 1226 (La.App. 4 Cir.1988), writ denied, 538 So.2d 597 (La.1989).
In addition, as will be discussed below, other courts have held that public entities have no legal duty to anticipate unforeseeable criminal acts that occur in public places.[5]
*915 Thus, our review then, is to determine whether the jury was manifestly erroneous in finding that Jefferson Parish used reasonable care or ordinary care in regard to the plaintiffs and therefore was not negligent or at fault for the injuries sustained by plaintiffs resulting from the criminal acts which occurred on the MAC premises.
At trial, the jury was presented with the following evidence: Tim Whitmer, for Administrator of the Westbank recreation Department, testified that, depending on the type of event, the booking and policy procedure in 1992 was silent as to the specific age of those who would rent a facility, and that the determination was made on a case-by case basis by the supervisor. Whitmer also testified that in regard to the department's 1992 policies, there were no specific number of chaperones was needed if the renter was under 18 years of age, and that this, once again, was left to the supervisor on a case-by case basis for "same day bookings." Whitmer stated that typically only one park personnel would be on hand for an event unless it was a rather large event. The staff member on hand would also have the authority to shut down the party at his discretion. For events that served alcohol, "one uniformed deputy" was required for gathering of 100-199 people; however, same day bookings with no alcohol would not require a policeman.
The supervisor's responsibility was to make sure that "nothing exceeded that it was supposed to exceed" and that "everything was under control." There was no formal procedure in place stating when a supervisor is supposed to call the Jefferson Parish Sheriff's Office. This was also left to the discretion of the supervisor on a case-by-case basis. Whitmer further stated that after his investigation into the incident, he was very pleased with Coleman's performance, and felt that Coleman had gone above and beyond his job duties by calling police earlier in the evening to monitor the MAC.
Lakesha Lambert testified that she rented the room at the MAC on the afternoon of the day that the party took place, accompanied by a man, Tracy Kent, who was over 30 years old. She put on the rental form that she was going to have approximately 100 people at the party. She also put on the form that there would be eight chaperones. The party would take place from 8:00-1:00 a.m, and was by invitation only. Notably, she did not invite plaintiffs Cory Henry, Kim Henry, or Curtis Jones to the party. She did not have any chaperones scheduled for the party, however her mother and aunt stopped by during the party and stayed for the duration. She recalled seeing MAC supervisor, William Coleman, checking in on the party. Lambert testified that there was no one smoking inside the room, and that she did not have liquor at her party, although people downstairs may have been drinking. Adults who attended the party were Linda Lambert, her mother, Brenda Frazier, her aunt, Tracy Kent, and Tammy Williams. Lambert's mother turned away people at the door who did not have invitations.
William Coleman was the MAC supervisor at the time of the party. He testified that Lambert had an adult with her at the time she made the booking. He stated that it was impossible to get a deputy on same day bookings through the Sheriff's department. When the party started, Coleman saw three or more adults in the party room at the time the party started. At no time during the night did the party exceed 100 people. Coleman said that he checked in the party room several times that night. At 8:15, he called police and asked for a unit to pass through during normal rounds. He also checked the parking *916 lot several times that night as well. Coleman testified that he never saw marijuana or alcohol at the party or in the parking lot during the night. At 10:00 p.m., Coleman called police to report excess cars in the parking lot.
Coleman consulted with Mrs. Lambert and told her that if the crowd outside became unruly, he would shut the party down. At approximately 12:00 a.m., Coleman did shut the party down because of the crowd. Lambert told him that she did not know the people outside. While shutting down the party, Coleman called police to help flush out parking lot. While on the phone with police, he heard the first shot fired.
At trial, the plaintiffs presented testimony, however, that painted the event in a different light altogether. By way of summary, in their brief, appellants characterize the scene at the MAC on the night in question as follows:
Hundreds of teenagers came to the MAC Playground that night. The ninety-six parking spaces at the playground were full. Both the room that was rented and the parking lot was filled with teenagers. There was beer, malt liquor, pot smoking and guns on the premises... The party was out of control, with no uniformed deputy, adequate chaperones, grown ups or security guards. Because of the lack of supervision, the teenagers at the party were allowed to party virtually unrestrained, drinking alcohol, using drugs, carrying weapons, violating curfew and essentially running amok. Numerous altercations occurred at the party. During the evening, MAC supervisor Coleman twice calls the emergency 911 line to summon sheriff's deputies to the scene before the shootings, but fails to terminate the party.
In support of their assertions of Jefferson Parish's alleged negligence, plaintiffs solicited the testimony of three experts who concluded that Jefferson Parish's negligence consisted of several acts, both leading up to and on the night of the party itself. In summary, the alleged acts of negligence were: renting the activity room to a minor; failing to explain the Recreation Department's stated policy and procedures as they pertained to the room rental; not requiring a JP Deputy to be on duty, and not requiring adult supervision, despite knowledge of "the known characteristic and instincts of minors when gathered in a group, and the probability of serious injury when such supervision is not required"; that Coleman should have been on hand to supervise the party; a recreation employee should have patted down party goers for weapons; Coleman should have shut down the party earlier if more than 100 persons attended; Coleman had a duty to shut the party down when a crowd appeared in the parking lot at 10:16 p.m.; and finally that the shooting was foreseeable because it occurred in a high crime area.
In spite of these assertions and according testimony by plaintiff witnesses, the jury had ample evidence before it to conclude that Jefferson Parish exercised reasonable or ordinary care in regard to the party. In particular, the record contains testimony that Coleman did not violate the Jefferson Parish policy in renting the room to Lambert, and that such rentals were left to the supervisor's discretion. There was testimony that for events that served alcohol, "one uniformed deputy" was required for gathering of 100-199 people; however, same day bookings with no alcohol would not require a policeman. Additionally, Coleman also testified that JP Deputies could not be obtained for security in instances where the party was booked and would occur on the same day. Based upon our review of the record, we further *917 find no error in the jury's determination that the Parish had no duty, through William Coleman, to conduct pat down weapon searches of the guests entering the party in the upstairs room.
In regard to plaintiff's claims of inadequate adult supervision, we note the following: Lambert indicated on the MAC rental form that she expected to have eight chaperones at the party. While this number was not accurate, and she, in fact, had not secured chaperones for the party, both Lambert's mother and aunt were present at the party on the night of the shootings. Coleman testified that at the beginning of the party, he noted that three adults were present. The record indicates that at least five named adults were present at the party over the course of the evening: William Coleman, Linda Lambert, Brenda Frazier, Tracy Kent and Tammy Williams. Coleman testified, and corroborating testimony established, that he, himself, had checked in on the party several times during the night, further employing the aid of Jefferson Parish Deputies to monitor the proceedings.
The record contains conflicting testimony regarding the number of persons present at the party, pertaining to both the crowd contained in the upstairs room of the MAC, and in the parking lot. Based on the testimony, however, the jury apparently determined that Coleman did not let the party in the upstairs room exceed 100 persons. In regard to the uninvited crowd that had assembled in the parking lot downstairs, however, the record shows that Coleman summoned Jefferson Parish Deputies at approximately 10:00 p.m. that night to report an excess of cars in the parking lot. As defendants point out, the Deputies that did appear to assess the scene determined that no intervention was necessary. The jury was further presented with Coleman's testimony that he finally made the call to close down the party and request police assistance when the crowd assembled in the parking lot became unruly. It was during this call for assistance that the shootings occurred.
As previously stated, Lakesha Lambert testified that the plaintiffs were not invited guests to her party which took place on the night of November 14, 1992. The jury was further presented with evidence that the plaintiffs were involved in a verbal altercation that occurred just prior to the party at the Belle Promenade Mall, located on the West Bank of Jefferson Parish. A group from Marrero, that included Curtis Jones and Corey Henry, took issue with the fact that members of a rival Westwego group, had communicated with a certain female while at the mall. Carl Jones, who was present at the Belle Promenade incident as a member of the Marrero group testified that the Westwego group went to the MAC on the night of the party with the "mall incident" on their minds. Brandon Craig also testified that after the shootings of Corey Henry and Curtis Jones, the only reason he could come up with for why it happened was the incident at the mall. Based on the foregoing, it would not have been unreasonable for the jury to determine that the shootings which took place were not related to the MAC party at all, but were a continuation of events that had occurred previously that evening, and were wholly unrelated to the party conducted in the upstairs room of the MAC. This conclusion was further bolstered by the testimony of plaintiff's expert, Dr. Wade Schindler who testified as follows:
DEFENSE COUNSEL:
I'm asking you if based on your review of the materials, the confrontation at the Belle Promenade Mall, had they met up right outside the gates of the playground, isn't it a fact, Mr. Schindler, *918 that this would have gone down right there, and that they just happened to be in the parking lot at MAC Playground?
SCHINDLER:
It could have happened anywhere.
Appellants arguments related to the forseeability of the shootings because of the location of the MAC in a high crime area, as testified to by plaintiff's expert, Wade Schindler, apparently merited little consideration by the jury. We note that the court in Sutter v. Audubon Park Commission,[6] addressed a similar issue. In Sutter, the plaintiff was shot in a restroom in Audubon Park in New Orleans, and was rendered a paraplegic. Sutton argued at trial that the Audubon Park Commission, the park's operator, was liable for his injuries because they had knowledge of several crimes that had previously occurred on the premises and did not provide special protection. The court, in reversing the lower court, held that Mr. Sutter's shooting "was a random, unforeseeable criminal attack which could not easily have been prevented," and that the Commission had no legal duty to anticipate such an attack.
In this case, Schindler testified that there had been no homicides at the MAC prior to November 14, 1992. Accordingly, based on the foregoing, we find that the jury did not commit manifest error in finding that Jefferson Parish was not at fault or negligent for plaintiff's injuries on the grounds that such an attack was foreseeable.
In their second assignment of error, plaintiffs assert that the trial court erred in failing to instruct the jury about legal fault under La. C.C. art. 2317, regarding the legal doctrine of garde, thereby tainting the verdict.
La. C.C. art. 2317 states:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications. (Emphasis added).
In LaFrance v. Bourgeois,[7] we noted the standard for appellate review for jury instructions:
In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law ... Adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. In making his charges to a jury, a trial judge is not required to give the precise instructions submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case ... The adequacy of jury instructions must be determined in light of the jury instructions as a whole. (Citations omitted).
In Toups v. Cochran,[8] the Court rejected a similar argument to the one that plaintiffs make in the case at bar. In Toups, the plaintiff was beaten in the parking lot of a supermarket. At trial, plaintiff alleged that defendants breached a duty to protect the plaintiff from third party criminal acts, further asserting a *919 strict liability claim under La. C.C. art. 2317. In that case, the court held:
Plaintiffs contend that A & P is strictly liable to them pursuant to LSA-C.C. art. 2317, which imposes a legal duty upon all persons to be responsible for things in their custody. For this theory to apply plaintiffs must prove that 1) the thing which caused damage was in the care and custody of the defendant, 2) the thing had a vice or defect which created an unreasonable risk of harm, and 3) the injuries were caused by defect ... Plaintiffs do not even allege liability under these factors much less offer evidence to support them. In short, Art. 2317 has no application to this case. This is a simple negligence claim under C.C. art. 2315, which imposes liability upon one who causes damage to another.
(Citations omitted).
Similarly, in this case, we find that the plaintiffs have failed to show the applicability of the proposed charge. Further, in reviewing the jury instructions as a whole, we find the trial judge adequately instructed the jury as to the law as it pertained to the issues in this case. In particular, the record reflects that the trial court properly instructed the jury as to the duty owed by a premises owners toward persons on their property, specifically, the duty to protect others from the criminal acts of third parties. Accordingly, this assigned error lacks merit.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
NOTES
[1] 283 So.2d 716, 724 (La.1973).
[2] 782 So.2d 606, 612, XXXX-XXXX La. 3/23/01, (La.2001).
[3] 99-1222 (La.11/30/99), 752 So.2d 762,
[4] 97-1254 (La.App. 5 Cir. 4/28/98), 710 So.2d 1200.
[5] Sutter v. Audubon Park Commission, 533 So.2d 1226 (La.App. 4 Cir.1988), writ denied, 538 So.2d 597 (La.1989).
[6] 533 So.2d 1226 (La.App. 4 Cir.1988), writ denied, 538 So.2d 597 (La.1989).
[7] 97-376 (La.App. 5 Cir. 10/15/97), 701 So.2d 1026.
[8] 98-0331 (La.App. 4 Cir. 10/7/98), 720 So.2d 140.